UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-14047-CR-ROSENBERG/LYNCH

UNITED STATES OF AMERICA,

　　　Plaintiff,

v.

ANDREW CUNNINGHAM, III,

　　　Defendant.

_____/

FILED by _____ _eal_ ___ D.C.

DEC 1 0 2015

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

REPORT AND RECOMMENDATION ON DEFENDANT'S
MOTION TO SUPPRESS ALL EVIDENCE SEIZED AND
POST-ARREST STATEMENTS ELICITED [D.E. #35]

THIS CAUSE having come on to be heard for an evidentiary hearing on November 18, 2015, and this Court having received evidence, testimony, and arguments of counsel makes the following recommendations to the District Court:

1.　　At the outset of the Suppression Hearing, counsel for the government announced that the portion of the motion dealing with suppression of any of the Defendant's statements has been resolved.  AUSA Lineberger stated that statements made by the Defendant to Detective Flynn, after the Defendant was in custody, will not be introduced by the government during its case in chief.  However, if the Defendant does testify in this case any such statements could be used for impeachment purposes.

2.　　Counsel for the Defendant, Mr. Smith, agreed that would resolve the issues relating to the Motion to Suppress Statements and make that portion of the Motion to Suppress moot.

3.　　The motion asserts certain deficiencies in the search warrant issued by a state judge which resulted in the seizure of evidence in this case.  Normally the Defendant would have the burden of going forward in respect to such a motion.  However, there are

other issues relating to consent to search the residence of the Defendant's mother where the Defendant occupied a room. Therefore counsel for the government, AUSA Lineberger, agreed to proceed by calling witnesses first.

4.      The first witness to testify was Deputy Stripling of the Martin County Sheriff's Office. He has been employed by that agency for some 28 years. He has served in various capacities. At the times pertinent to the issues in this case, Deputy Stripling was a road patrol officer primarily assigned to Indiantown, Florida. Government's Exhibit No. 1 admitted into evidence at this hearing is a schematic map of the Booker Park area of Indiantown, Martin County, Florida. The witness circled two residences which are pertinent to the issues in this case. Those residences are listed as 17250 Lincoln Street and 14844 S.W. 171st Drive. Both of these residences are in Indiantown, Florida.

5.      Deputy Stripling knows both of these residences and is familiar with them having taken calls there before. The Defendant was identified in open court by Deputy Stripling as an individual who he had contact with at the times pertinent to the issues involved in this case.

6.      On May 4th and 5th of 2015, Deputy Stripling was on duty, in uniform and in a marked Martin County Sheriff's Office unit. On May 4th he was working the day shift from 6:30 a.m. to 3:00 p.m. He received information via his official radio that other officers were reacting to a specific call for assistance in the Indiantown area. The reports were of someone breaking a window and also gunshots. This Defendant was identified by someone as having a weapon wrapped in a shirt in the area where shots were fired. Deputy Stripling was overhearing this radio traffic on his official Martin County Sheriff's Office radio. Other officers were involved in that call, he was not.

7.      Government's Exhibit No. 2 admitted into evidence at this hearing is a computer assisted document relating to a call of vandalism on May 4, 2015 in the Indiantown area.  Government's Exhibit No. 3 admitted into evidence at this hearing is a call in the same vicinity of an armed and dangerous individual on May 4, 2015. Government's Exhibit No. 4 admitted into evidence at this hearing is another call for vandalism that same date in the same area.  Government's Exhibit No. 5 admitted into evidence at this hearing is a harassing/obscene call in the same area of Indiantown, Florida on May 4, 2015.

8.      Deputy Stripling reviewed the exhibits referenced above and identified Government's Exhibit No. 2 as a call by a complainant of a truck window being broken by this Defendant.  Government's Exhibit No. 3 refers to the Defendant by name, race, and clothing with an unknown weapon wrapped in a shirt exhibiting that weapon in a dangerous manner in public.  Government's Exhibit No. 3 and the information received by Martin County Sheriff's Office in that complaint stated that the Defendant was in the roadway yelling and acting crazy.

9.      Government's Exhibit No. 4 is a vandalism call at 169th Drive regarding a broken window in a house.  The caller identified this Defendant again by name and appearance similar to the description in Government's Exhibit No. 3.  Government's Exhbiit No. 5 is another location where the Defendant is referred to by name as harassing someone on Lincoln Street.

10.      The next day, May 5, 2015, Deputy Stripling was dispatched to the fire station adjacent to the Martin County Sheriff's Office Sub-Station in Indiantown.  The call was for a shooting victim having arrived at the fire station seeking aid from the emergency services

personnel at the fire station.  Upon arrival, Deputy Stripling identified the Defendant as the person who was there seeking treatment for a gunshot wound to the stomach.  He saw the Defendant on a stretcher in an ambulance.  The Defendant was not in custody at the time. The Defendant said that he did not know who had shot him.  An individual by the name of Shirley Ann Adamson and the Defendant's mother were present at that location as well.

11.     Deputy Stripling received information that Ms. Adamson had picked up the Defendant at his mother's house, where he also resided.  Deputy Stripling was told that the Defendant did not want to call the police.  Ms. Adamson and the Defendant's mother convinced the Defendant to go into the fire station to seek medical aid.  Deputy Stripling saw another deputy by the name of Brooks with a baggie with spent shell casings in it that Ms. Adamson had given to this deputy at the fire station.  Deputy Stripling then went to the Defendant's mother's residence at 14844 S.W. 171st Drive in Indiantown, Florida.

12.     Government's Exhibit No. 6 admitted into evidence at the hearing is another computer assisted dispatch call from May 5, 2015 referencing the call to the fire station referenced above.  It reflects why Deputy Stripling responded to that location and then later going to the Defendant's mother's house in Indiantown.  The Defendant was taken to the hospital by EMS.  Before he was taken, a large pocket knife and a smaller pocket knife were taken from the Defendant's person.  Nothing else was taken into evidence.

13.     When Deputy Stripling arrived at the Defendant's mother's house, several other deputies were already there and some were inside the home.  Deputy Stripling went into the kitchen area of the home and took statements from the Defendant's mother and the Defendant's sister concerning the shooting incident.  The Defendant's mother, Ms. Jackson, was already inside the residence when Deputy Stripling arrived.

4

14.     Sergeant Stokes told Deputy Stripling that they needed to get a written consent to search the house.  Deputy Stripling then obtained that consent form from his car and returned into the residence.

15.     Government's Exhibit No. 7 admitted into evidence at this hearing is the Consent to Search Form completed by Deputy Stripling and signed by Patricia Jackson, the Defendant's mother.   The consent was regarding the shooting that had occurred outside the house where the Defendant was shot.  Deputy Stripling watched Ms. Jackson read the form and sign it in his presence at approximately 10:00 a.m. on May 5, 2015. Deputy Stripling was the one who completed the form and Ms. Jackson simply signed it after reviewing it in his presence.  There were no threats or coercion by Deputy Stripling to get Ms. Jackson to sign the consent form.  While Deputy Stripling did not tell Ms. Jackson that she had the right to refuse to consent, the form does have that language advising her that she did have the right to refuse to consent and also consult an attorney.

16.     On cross-examination, Deputy Stripling stated that the information he was hearing over his police radio on May 4, 2015 referred to the Defendant as having a weapon.  It did not specifically describe the weapon as being a firearm or gun.  Also, Ms. Adamson told Deputy Stripling at the fire station on May 5th that the Defendant did not want to have police called because he did not want to cause a scene at his mother's house.

17.     When Deputy Stripling arrived at Ms. Jackson's residence, there were already other officers inside, as referenced already in his testimony.  Sergeant Stokes and Deputy Olson were in another part of the house when Deputy Stripling arrived.  He estimated that it took him thirty to forty-five minutes to complete the witness statements with the Defendant's mother and Defendant's sister.  He confirmed also that he did not read the

consent form aloud to Ms. Jackson. She read it on her own. She did not ask any questions of Deputy Stripling in respect to the consent form. She did sign it after reading it. He has no idea what took place inside Ms. Jackson's residence prior to him arriving at the scene.

───────────

18.     Deputy Andrea Olson of the Martin County Sheriff's Office was the next witness called by the government. She has been with the Martin County Sheriff's Office since January of 2015. She was in a field training program and on road patrol on May 5, 2015 in Indiantown, Florida. She was not familiar with the Indiantown area or the other officers of her department at that time. She was operating with Deputy Bundy at the time.

19.     She and Deputy Bundy responded to the Defendant's mother's residence on that date. It was a request for assistance. They arrived and met with Sergeant Stokes who told them he was waiting for the Defendant's mother to arrive to go into the home. While waiting, Deputy Olson and the other deputies were simply looking around the area for bullet holes in the house and shell casings on the ground. No one was yet in the home since Ms. Jackson had not returned from the fire department as of that time.

20.     The Defendant's mother, Ms. Jackson, and another younger lady, the Defendant's sister, arrived shortly thereafter. She does not recall which deputy was talking with the Defendant's mother. Deputy Olson did overhear some discussion concerning wanting to look for a weapon inside because of a shooting. Deputy Olson did overhear the Defendant's mother state that if there was a weapon in her home she did not want it in her home.

6

21.     Deputy Olson observed the Defendant's mother open the door to her residence.  Sergeant Stokes and another deputy and Deputy Olson then entered the residence.  Sergeant Stokes said they were looking for a firearm in her son's bedroom. The Defendant's mother, Ms. Jackson, then pointed out the bedroom occupied by her son, this Defendant.  Deputy Olson and Sergeant Stokes then walked into that room and searched it briefly.

22.     Deputy Olson saw a jacket on the floor.  She picked it up and could tell that it was "weighted."  She felt a gun inside.  She told Sergeant Stokes and then put the jacket back on the floor.  They all then backed out of the room at that time.

23.     Detective Flynn was at the scene and told Deputy Olson and Sergeant Stokes to not search and that she was getting a search warrant.  This was as Deputy Olson and Sergeant Stokes were coming out of the bedroom.  Deputy Olson estimates that they were in there approximately five minutes before Detective Flynn came up to them and advised them that she was obtaining a search warrant.

24.     Deputy Olson did not see anybody knocking on the door with Ms. Jackson inside.  She saw Ms. Jackson arrive and open the door for the deputies.  Further, Deputy Olson did not see any deputy simply walk past the Defendant's mother and start searching. They walked into the home after Ms. Jackson opened the door for them.

25.     Deputy Olson testified that she believed Sergeant Stokes already had consent from Ms. Jackson to search the bedroom where the Defendant resided.  Ms. Jackson did nothing to indicate that they did not have consent nor anything to indicate that she wished for them to leave her home.

26.     Government's Exhibit No. 18 admitted into evidence at this hearing is a photograph of the bedroom pointed out by Ms. Jackson as being occupied by the Defendant.  This is the bedroom that Deputy Olson testified to that she searched and found the jacket on the floor with the gun inside.  She did not remove the handkerchief or the gun from the jacket.  She does not recall how long she was at the residence on May 5, 2015 before the Defendant's mother and sister arrived.

_____

27.     The next witness called by the government was Sergeant Stokes of the Martin County Sheriff's Office.  He has been with that agency for some 18 years.  He responded on May 4th to a call on Lincoln in Indiantown, Florida, regarding a complaint that someone had broken out a window and also a later vandalism call that same date at a residence on 169th Drive in Indiantown.   These calls are referenced in the exhibits referenced in Deputy Stripling's testimony above.

28.     Sergeant Stokes also received calls about the Defendant being in the area of Martin Luther King Boulevard in Indiantown, Florida, with a firearm.  This information was received over his police radio.

29.     On May 5th he responded to the fire department for a call of an individual being treated for a gunshot wound.  Sergeant Stokes identified the Defendant at this hearing as the individual who was at the fire station seeking medical aid for a gunshot wound to his stomach.  He did not talk with the Defendant at that time.  The information he had received was that there was a shooting at the Defendant's mother's house, so he went to that location.  He had never been to that residence on 171st Drive before.

30.     Government's Exhibit No. 12 admitted into evidence at this hearing is a photograph of the Defendant's mother's house referenced in this hearing.  Government's Exhibit No. 13 admitted into evidence at this hearing is a photograph of a bloody towel on the front porch of that residence.  Government's Exhibit No. 15 admitted into evidence at this hearing is a photograph of the inside hallway of Ms. Jackson's residence. Government's Exhibit No. 16 admitted into evidence at this hearing is another photograph of the hallway with the open door to the Defendant's bedroom.

31.     Upon arrival at the Defendant's mother's home, she was not there yet. Therefore, Sergeant Stokes took charge of the area and told the other deputies on scene to look around the area for evidence of the shooting of the Defendant.  They were told that Ms. Adamson had turned over shell casings at the fire department that she had found in the area.

32.     Approximately fifteen to twenty minutes after arriving at Ms. Jackson's residence, Ms. Jackson arrived there with her daughter, the Defendant's sister.  Sergeant Stokes spoke with the Defendant's mother.  He told her that they were there investigating the shooting of her son and would like consent to search the residence for evidence of the shooting and the complaints of the Defendant having a firearm the previous day.   The Defendant's mother, Ms. Jackson, said "okay" and opened the door of the home for them to enter.  Ms. Jackson said the Defendant's room was down the hall on the right and led them to that room.  However, she did not go in the room.  Ms. Jackson returned to the kitchen table area where Sergeant Stokes saw her completing the Consent to Search Form and witness statements.  Sergeant Stokes had told Deputy Stripling that they needed the

Consent to Search Form completed and after Deputy Stripling retrieved that form, this was being done at the kitchen table.

33.    The door to the Defendant's bedroom was open when they entered the home. The room was briefly searched by Sergeant Stokes and Deputy Olson. Government's Exhibits Nos. 17, 18 and 19 admitted into evidence at this hearing are photographs depicting the Defendant's bedroom as they saw it when they entered.

34.    Sergeant Stokes testified that he briefly scanned the room with his eyes as well as the top of the dresser depicted in the exhibits. He also looked into an open closet door in that bedroom. He heard a "clunk" as he was telling everyone to get out of the room to wait for them to get a search warrant. This was when Deputy Olson was putting the jacket back down on the floor that she felt the gun in. It made a "clunking sound" when she placed it back on the floor of the bedroom.

35.    Sergeant Stokes testified that nothing else was found in the room before they exited the room. He wanted to get a search warrant to make sure all was done correctly. He told Deputy Sheriff Barlow to stay at the door so no one would enter the bedroom and then walked back to the kitchen area where the Defendant's mother and Deputy Stripling were filling out forms. Sergeant Stokes then went outside.

36.    He does not recall Detective Flynn ever telling them to not search without a warrant. Ms. Jackson was not forced to leave the residence by anyone while he was present.

37.    On cross-examination, Sergeant Stokes admitted that he did believe he had probable cause for a search warrant upon his first arrival at the scene. Ms. Jackson never said that the Defendant had a firearm. The Consent to Search Form was being completed

as he and Deputy Olson went back to the bedroom.  However, he cannot say the form had been actually signed by Ms. Jackson before they got to that bedroom.

38.     Sergeant Stokes believes that he and Deputy Olson were in the room thirty seconds to a minute before Deputy Olson found the gun in the jacket.  They then left the room.

39.     On re-cross, Sergeant Stokes stated that he decided to get a search warrant to do things correctly right about the time that Deputy Olson picked up the jacket with what appeared to be a firearm in it.  He took all of the information that he had accumulated from the various calls he was privy to on May 4th and May 5th into his decision-making that a warrant should be obtained.

_____

40.     The next witness called by the government was Detective Flynn of the Martin County Sheriff's Office.  She was a detective on the scene at the Defendant's mother's home on May 5, 2015.  She now is a road patrol sergeant.  She had responded to Ms. Jackson's residence regarding a shooting victim who had appeared at the fire department in Indiantown seeking medical aid.  Detective Flynn identified the Defendant in court at the hearing as the individual she knew to be Andrew Cunningham, III.

41.     While on duty on May 4, 2015, Detective Flynn had heard over the police radio various calls referenced earlier during the testimony of other witnesses.  This Court will not reiterate all of those calls, specifically the ones identified in the exhibits during Deputy Stripling's testimony.  These calls involved the Drayton residence on Lincoln in Indiantown, Florida.  The Defendant's cousin resides there.  There was a vandalism call

to that residence concerning a breaking of a window in the Defendant's cousin's vehicle. The Drayton residence is referred to on Government's Exhibit No. 1 as the Lincoln Street residence. The Defendant's mother's residence is the residence on 171st Drive listed in Government's Exhibit No. 1.

42.     On May 5, 2015, Detective Flynn spoke with the Defendant's sister as well as a neighbor named Mr. Perkins and Mr. Perkins' daughter. The conversation with Mr. Perkins' daughter was over a telephone. Detective Flynn believes the Defendant's mother was up near her front porch area of her home at the time that Detective Flynn was talking with these other witnesses.

43.     The Defendant's sister said that she had seen the Defendant earlier in the day and he had told her that their cousin, Day, had shot him and was in a red F-150 truck with someone else.

44.     Mr. Perkins told Detective Flynn that he was asleep at the time and was awoken by gunshots. He looked out and did not see anything. He said his daughter had told him that she had seen a red F-150 truck speed off from the area at or about the time the shots were fired. All of this took place in front of the Defendant's mother's home.

45.     Detective Flynn learned that there were deputies inside the home getting a consent to search. She told Sergeant Smith to go tell the officers not to search until they heard from her. She then went to Ms. Jackson's house. It was her understanding that Ms. Jackson had already signed the consent form. However, she did not know for sure if any evidence had yet been found by the time that Detective Flynn arrived at Ms. Jackson's residence. She then decided to apply for a search warrant.

12

46.     Government's Exhibit No. 9 admitted into evidence at this hearing is the General Affidavit for Search Warrant completed by Detective Flynn.  Government's Exhibit No. 9A admitted into evidence is the Search Warrant for the home.  Government's Exhibit No. 10 admitted into evidence is the Search Warrant Inventory.  Government's Exhibit No. 11 admitted into evidence is the property receipt for items seized during the search.

47.     Over her career as a law enforcement officer with the Martin County Sheriff's Office, Detective Flynn estimated that she has obtained 100 or so search warrants in Martin County.   She is not familiar with the courts there using a raised seal in her experience.  She completed the affidavit referenced above in Government's Exhibit No. 9. It was reviewed by representatives of the State Attorney's Office and approved.  It was then presented to Judge Disque for signature.  She observed Judge Disque sign the original Search Warrant in her presence as well as the Affidavit.

48.     Detective Flynn spoke with the Defendant's mother at her dining room table in her home before getting the search warrant.  Ms. Jackson told Detective Flynn that she and Shirley Ann Adamson had taken the Defendant to the fire department after he was shot.  She told Detective Flynn that the Defendant said he needed to go back into the house.  Apparently Ms. Adamson was driving him to the fire department and Ms. Jackson was going to follow in a separate vehicle.  The Adamson vehicle turned around and the Defendant told his mother that he needed to go back inside the home.  The Defendant told her not to worry about why he was going back in the home, he just needed to go do that.

49.     Back when the shooting occurred, Ms. Jackson said that she had been in her bedroom.  She heard gunshots.  She got up and no one was in the house.  She saw a

black jacket on the sofa and went outside to see if she could see anything.  She could not and then returned inside her home.

50.     The Defendant's sister told Detective Flynn that she saw the Defendant earlier that morning wearing a black jacket.

51.     Detective Flynn walked down the hallway to the Defendant's bedroom with Ms. Jackson and asked if that was the same jacket on the floor as she had seen earlier. Ms. Jackson said that it was the same jacket.  Ms. Jackson said that the Defendant must have come back in the house and put it in his room.  Government's Exhibit No. 18 is as Detective Flynn first saw the jacket with the red bandana on the floor.

52.     Back to when Detective Flynn first began speaking with Ms. Jackson at the dining/kitchen table, Deputy Stripling showed Detective Flynn the consent form which had been signed by Ms. Jackson.

53.     Detective Flynn's Affidavit for Search Warrant summarized all of the facts that she had learned about the investigation.  During her interview, Ms. Jackson said that she did in fact clean her son's room.  He did not pay her any rent.  The door to the Defendant's bedroom was not locked or even closed when law enforcement arrived on the scene.

54.     Government's Exhibit No. 14 admitted into evidence at this hearing is a photograph of the Search Warrant which was being executed at Ms. Jackson's home. Government's Exhibit No. 20 admitted into evidence is a photograph of the black jacket being held up.  Government's Exhibit No. 21 admitted into evidence is the red bandana mentioned during the hearing.  Government's Exhibit No. 22 admitted into evidence at this hearing is a photograph of the firearm taken from the pocket of the jacket as it was wrapped in a red bandana.  Government's Exhibit No. 23 admitted into evidence is a

14

photograph of what purports to be the Defendant's wallet.  Government's Exhibit No. 24 admitted into evidence is a photograph of the Defendant's identification taken from the wallet.

55.    Detective Flynn testified that Ms. Jackson was completely cooperative the entire time.  Ms. Jackson never said that she did not consent to the search of the home. She never told any of the deputies, in Detective Flynn's presence, not to search the home or to stop searching the home.  Ms. Jackson completed a second Consent to Search Form, Government's Exhibit No. 8 admitted into evidence at this hearing, relating to a cell phone of hers.  This was executed several days later.

56.    On cross-examination, Detective Flynn stated she had no prior knowledge of the Defendant having any black jacket or red bandana before preparing for the search warrant.  She learned of a possible gun in the jacket from Deputy Olson found during the initial search of the bedroom.  The shell casings were found in a swale area at the property line between Ms. Jackson's property and the neighbor's property.  She does not know what firearm they came from.  Detective Flynn confirmed that the Defendant's mother never asked about nor stated anything about a red bandana nor a firearm in her home in Detective Flynn's presence.

57.    The portion of the affidavit which references a red bandana is wrong according to Detective Flynn.  This information about the firearm being wrapped in a red bandana is incorrect.  The information she had was that the weapon was actually wrapped in a shirt.  The Defendant's mother said that the Defendant wanted to return to the house. He at no time told Ms. Jackson anything about a black jacket with a red bandana as appears in Detective Flynn's affidavit.  Detective Flynn admitted that that was incorrect.

15

58.     Regarding the Defendant returning to the home, Ms. Jackson told Detective Flynn that he simply said he needed to go back in the house and not to worry.  He did so and then came back out.

59.     Detective Flynn testified that when she spoke with Ms. Jackson about seeing a black jacket on the sofa initially, it looked like "a lightbulb went on" in Ms. Jackson.  Ms. Jackson then said to Detective Flynn that must be why the Defendant went back in the house.   This is when Detective Flynn and Ms. Jackson then walked back to the Defendant's bedroom and Ms. Jackson identified the jacket on the floor as being the same jacket she had seen on the sofa earlier before the Defendant had gone back into the home.

60.     Detective Flynn stated that the items listed in the affidavit had already been found by the deputies in the initial search of the Defendant's bedroom.  The Defendant's sister had told Detective Flynn that the Defendant had a black jacket on earlier that morning before he was shot.

_____

61.     The government then rested its case and its presentation of evidence in respect to the motion.

_____

62.     The Defendant then presented one witness, Patricia Jackson, the Defendant's mother.  She resides at 14844 S.W. 171st Drive in Indiantown, Florida.  The Defendant was residing with her at the time on May 5, 2015.  On that day she heard gunshots.  She jumped up out of bed and went outside.  She looked around and did not

see anything.  She then returned to her bedroom.  An hour or so later, her daughter came in and said that the Defendant had been shot.  She got dressed and went out to the porch of her home.  She saw the Defendant there with blood on his clothing.  Shirley Adamson was there as well.

63.     Ms. Jackson told the Defendant he needed to get to the emergency room. The Defendant said no.  She does not recall what the Defendant said exactly.  Ms. Adamson convinced the Defendant to get medical assistance and she would drive him. Ms. Jackson got in her own car to follow them.

64.     Before they could get to the fire department, Ms. Adamson turned her vehicle around.  The Defendant told Ms. Jackson he needed to go back in the house.  She saw the Defendant get out and walk towards the house.  She did not even see if he went inside. She then saw him return and get back in Shirley Adamson's vehicle.  She then followed them to the fire department in Indiantown where the paramedics treated the Defendant for his wounds.  She then waited there until they transported the Defendant to the hospital.

65.     Ms. Jackson testified that she then returned to her home with her daughter. Officers had arrived at the residence.  Before they had arrived there, Shirley Adamson had picked up spent shell casings off the ground near the residence and gave them to a deputy.

66.     Ms. Jackson was in her dining room area.  There was a knock on the door and the deputies asked if they could come in and she said yes.  She said that the deputies told her they were investigating a shooting.  Deputy Stripling said "where's his room?"

67.     Ms. Jackson said that she was "hurting at the time" because her son had been shot.  She pointed out the Defendant's room down the hallway of her home.  The

17

deputies then walked down the hallway alone.  She did not go with them.  She estimated the deputies were in the room 10 to 15 minutes.  She stayed in the dining room area with her daughter.

68.     Ms. Jackson then saw Detective Flynn arrive.  She knocked and asked where the other officers were.  Ms. Jackson indicated where they were in the bedroom.  She heard Detective Flynn say that they were not supposed to be there searching without a consent form.  Detective Flynn asked Ms. Jackson if she would sign a consent form.  Detective Flynn read it to her and the witness signed it after they had searched the bedroom.

69.     Ms. Jackson and her daughter gave statements about what they knew about the incident involving the shooting of her son.  The officers never told her they were investigating a crime allegedly committed by her son.  She thought that it was only about the Defendant being shot earlier that day.

70.     The officers told she and her daughter to leave the house while they were getting a search warrant.  She left to run some errands.  Detective Flynn then later called her to meet her back at the house around 4:30 to 5:00 p.m. that same day.  Upon arrival, the officers showed Ms. Jackson the search warrant.  They retrieved the jacket.  They opened it and got the gun and took pictures.

71.     She never saw the Defendant with a red bandana before.  She never told Detective Flynn why she believed the Defendant went back into the house.  She has never seen the Defendant with a gun.  She never saw the black jacket on the Defendant but she was familiar with that particular jacket.

18

72.     On cross-examination, Ms. Jackson stated that the Defendant's bedroom door does lock with a key and she has a key to that door.  However, it was not locked on May 5th.  Before he was shot, the Defendant had on a white t-shirt, shorts and shoes.  He had a black jogging suit similar to those that athletes wear which matches the jacket found on the floor of the Defendant's bedroom.

73.     She confirmed that when she heard shots and came out of her bedroom, she saw the black jacket on the couch.  She then saw Ms. Adamson picking up shell casings later alongside the property line of her property and those of her adjoining neighbor.

74.     Ms. Jackson does not recall what the Defendant said or that he was cursing at her when he was telling her he needed to go back in the house.  AUSA Lineberger then recited to Ms. Jackson certain portions of her grand jury testimony previously given in this case where she testified that the Defendant did in fact curse at her during that time.  Ms. Jackson stated that she does not have a "recall" about what happened.  She did admit that her grand jury testimony on July 16, 2015 was much closer in time and fresher in her mind than the events she is now attempting to recall.  She also admitted that she has spoken with the Defendant about the incident since he has been in jail.

75.     Ms. Jackson confirmed that the house was locked before she followed the Adamson vehicle to the fire department with her son.  She did not go back into the house until the police arrived there.

76.     Ms. Jackson admitted that the deputies did ask for permission to enter the house and she allowed them in.  She knew they were there to investigate her son's shooting.  She was asked where his room was.  She denies that the deputies asked for permission to enter the room until after they had already been in the room.

77.     Once again AUSA Lineberger referred to Ms. Jackson's grand jury testimony concerning the consent to search.  In her grand jury testimony, Ms. Jackson admits that she signed a consent to search the home and that she gave the deputies permission to search her house for evidence connected to her son's shooting.  She also confirmed in her grand jury testimony that she was cooperative with the police and that she had wanted the evidence out of her house.  She also confirmed during her grand jury testimony that she testified that when the police entered the home after the shooting, that Ms. Jackson did not see the black jacket on the couch where she had seen it previously.  She admitted in her grand jury testimony that she then saw that same jacket on the floor of her son's bedroom. It was lying open on the floor.

78.     Ms. Jackson denies telling Detective Flynn that the Defendant must have put it in his room.  However, once again AUSA Lineberger referred to Ms. Jackson's grand jury testimony.  In that testimony, Ms. Jackson admits that she testified before the grand jury that when she was asked how she thought the jacket got on the floor of her son's bedroom, she responded that "he put it there, because no one was in the house but him."  She admitted it was the same jacket.  She also admitted in her grand jury testimony as pointed out by AUSA Lineberger, that there was a bullet hole in the jacket in the same stomach area where the Defendant had received a gunshot wound.

79.     AUSA Lineberger also referred Ms. Jackson to her grand jury testimony that there was a gun wrapped in a red bandana in the jacket on the floor of her son's bedroom. She admitted that her son, this Defendant, had been previously convicted of a felony and was not allowed to carry a firearm.

80.     Ms. Jackson admitted on cross-examination that the door to her son's bedroom was not closed when the police asked to search.  They did not force her to sign the consent form.  She gave them permission as she was reminded from her grand jury testimony.  She admitted that she wanted them to look in the room and get any evidence out of her house.  She also knew that the Defendant and his cousin had been fighting.

_____

81.     The Defendant then rested without calling any further witnesses or introducing any items of evidence.  The government stated that it had no rebuttal testimony nor further evidence to submit to the Court in respect to the motion.

## ANALYSIS

82.     At the conclusion of the evidentiary hearing, this Court directed the parties to file their summations and closing arguments in respect to the evidence received at the hearing no later than December 4, 2015.  This Court requested the parties to file their arguments with citation to appropriate case law based upon the evidence presented at the evidentiary hearing.   This Court has considered both of the submissions from the Defendant [D.E. #48] and from the government [D.E. #49].   Those summations with citations to case law are incorporated into the record of the final evidentiary hearing just as if arguments had been made orally at the conclusion of the evidentiary hearing.

83.     Chronologically, the issue of consent comes first.  Whether or not a person has actually consented to a search is a general proposition determined on the individual facts and totality of the circumstances presented in each case.  United States v. Watkins, 760 F.3d 1271 (11th Cir. 2014).  Also, the search must be confined to the area for which

21

consent was given.  When an individual provides a general consent to search, as it appears was done in this case by Ms. Jackson, the search is constrained by the balance of reasonableness as to what a law enforcement officer could reasonably interpret the consent to encompass.  United States v. Zapata, 180 F.3d 1237 (11th Cir. 1999).

84.    The Defendant's mother, Ms. Jackson, testified concerning her recollections of the consent to search.  At first blush, her testimony appeared to conflict with those of the officers who testified at the evidentiary hearing before this Court.  However, counsel for the government then presented, by way of impeachment, certain portions of Ms. Jackson's testimony before the grand jury in this matter.  Based upon that impeachment, Ms. Jackson's testimony, in this Court's view, came to fall more in line with that of the officers who testified before she did at the evidentiary hearing.  It appeared to this Court that Ms. Jackson was attempting to couch her testimony in a fashion to be most helpful to her son without actually fabricating any of the testimony.  This Court is not implying that Ms. Jackson lied at any time during this hearing, but rather after the grand jury testimony was presented to her by way of impeachment, it is apparent that her recollection of the facts now was not as detailed as they were at the time she gave her grand jury testimony earlier in this matter.

85.    There is no question that the consent request was to search the home for evidence concerning the shooting of her son.  The Defendant occupied a room within Ms. Jackson's home.  She certainly had the right to grant consent, even to the room where her son resided within her home.  She regularly went into that room to clean and had a key to the door which was not closed nor locked at the time that the officers entered the home. At the very least, she had joint authorization to consent to the search of the entire home,

22

including the room occupied by the Defendant within her home.  United States v. Backus,
349 F.3d 1298 (11th Cir. 2003).

86.    The request for consent to search was not limited to a particular area.  It was
in regards to the shooting of her son.  The officers asked where his room was when they
confronted Ms. Jackson at her home.  She pointed out the Defendant's room down the
hallway.  When pressed by counsel for the government as to details, Ms. Jackson said that
she did not have a "recall" about exactly what happened.  It was then that the government
presented various excerpts of her grand jury testimony to "refresh her recollection."

87.    Ms. Jackson confirmed that the house was locked when she came back to
the home.  There were no officers within her home when she arrived back there after her
son was taken to the hospital from the fire station.  She admitted in her testimony that the
deputies did ask for permission to enter the house and that she allowed them in.  She
testified that she was aware that they were investigating her son's shooting and asked
where his room was.  She admits that she signed a consent form which was prepared in
the kitchen/dining room area of her home after verbal consent was given to the officers.
The particular testimony of that will not be reiterated here and can be reviewed by the
District Court earlier in this Report and Recommendation.

88.    Ms. Jackson's testimony was that she did give the deputies permission to
search her house for evidence concerning her son's shooting and that she was cooperative
with the officers.  She admitted in her grand jury testimony that when she re-entered her
home she saw that the black jacket which was previously on the couch was no longer there
and that she then saw the same black jacket on the floor of the Defendant's bedroom
where it was lying open on the floor area.  Before the grand jury, Ms. Jackson admitted that

23

the Defendant must have put it there because there was no one in the house but him after she had seen the jacket on her couch.  She also admitted that there was a bullet hole in that jacket.

89.     Ms. Jackson also testified that the officers did not force her to sign the consent form.  She testified that she gave them permission as she was reminded from her grand jury testimony at this evidentiary hearing.  She further testified that she wanted them to look in the room to get any evidence of the shooting out of her house.

90.     Based upon the totality of the circumstances and all of the evidence received as well as Ms. Jackson's testimony after being presented with excerpts of her grand jury testimony, this Court finds that there was a valid oral consent followed by a valid written consent to search her residence, including the bedroom occupied by the Defendant, for evidence of his being shot.  The area contemplated by the consent was Ms. Jackson's home and specifically the Defendant's bedroom.  There is no evidence that the search exceeded those limitations.  Those limitations were stated to Ms. Jackson before she granted oral consent and were reasonable in light of the evidence that the officers were seeking.

91.     The Court next moves on to the issue of the search warrant.  This Court conducted a Franks hearing within the Motion to Suppress since the Defendant alleged in his motion that the facts contained within Detective Flynn's affidavit were false or recklessly provided to the state court judge.  Pursuant to the standard in Franks v. Delaware, 438 U.S. 154 (1978), the Defendant bears the burden of establishing that absent any misrepresentations or omissions from such an affidavit submitted in support of a search warrant, that the warrant lacks probable cause.  The Defendant must establish that the

24

affidavit contained deliberate falsehoods or was prepared with reckless disregard for the truth when presented to the issuing state judge. If such matters are contained within the warrant, the Court then must set those aside to determine whether the remaining matters contained within the affidavit would be sufficient to support a finding of probable cause. Any false statements must have been made knowingly and intentionally since allegations of negligence or innocent mistake are insufficient under the <u>Franks</u> standard. Affidavits supporting such warrants are presumed to be valid. <u>See</u> <u>United States v. Vazquez</u>, 406 Fed. Appx. 430 (11th Cir. 2010).

92.     It is apparent from this Court's review of the affidavit submitted by Detective Flynn in support of the search warrant that she made certain "assumptions" and included those within her affidavit. Those "assumptions" and the facts relating thereto have been brought out during her testimony before this Court. Detective Flynn confirmed that Ms. Jackson never stated anything about a red bandana nor a firearm in her home as may be contained within the affidavit. Any reference to a red bandana is "wrong" according to Detective Flynn's testimony. Further, at no time did Ms. Jackson say anything to Detective Flynn about a black jacket with a red bandana as appears in the affidavit. Therefore, any of those references should be removed from the affidavit. Further, the shell casings which were found in a swale area between Ms. Jackson's property and the neighboring property were not specifically linked to any particular firearm. Any reference in Detective Flynn's affidavit referencing that the shell casings were found by Ms. Adamson because the Defendant was trying to cover up the incident, is not supported by the evidence and likewise should be excluded from the affidavit. Further, any reference in the affidavit that the Defendant went back into the home to remove the jacket is also not supported by the

evidence. There is no testimony that Ms. Jackson ever said that to Detective Flynn. Those references should also be excluded from the affidavit.

93.    After removing these specific references, as well as any others which the transcript reflects Detective Flynn admits were incorrect, this Court must then review the affidavit to see if there would have been sufficient evidence to still support issuance of the search warrant based upon the probable cause standard. This Court has looked once again at the affidavit attached to the application which has been admitted into evidence in this case and finds that it still contains more than sufficient facts to support a finding of probable cause that there may be evidence within Ms. Jackson's home regarding the shooting of the Defendant. The facts set forth in the affidavit go into the actions the previous day where the Defendant was having a confrontation with some individuals and continues on into the following day when the Defendant was shot in front of his mother's home, which was the subject of the search warrant.

94.    This Court does not believe that Detective Flynn was intentionally attempting to mislead the state judge nor was she intentionally falsifying any of the facts set forth in the affidavit. Based upon her testimony and her demeanor observed by this Court during this evidentiary hearing, it appears as though Detective Flynn was making certain assumptions and conclusions concerning the entirety of the investigation. She was taking those conclusions and placed them within the affidavit and she now admits that she was incorrect in doing so. Under the Franks analysis, the alleged misrepresentations must have been knowingly or recklessly made by the affiant and the result of the excluding of the alleged misrepresentations would have been a lack of probable cause. This Court cannot find that there has been evidence submitted by the Defendant which would support

26

the exclusion of the search warrant.  There were no intentional misrepresentations.  The statements and facts that this Court has excluded from Detective Flynn's affidavit appear to have been "assumptions" as this Court has referred to herein.  These were based upon the entire investigation and facts presented to Detective Flynn during her handling of the matter up to that point.  The Court finds no intentional falsehoods nor intentional misrepresentations.  Finally, the Court finds that there still remains sufficient probable cause contained within the redacted affidavit to support issuance of a search warrant by the state judge.

95.    While this Court is speaking about the issuance of the warrant by the state judge, the Defendant has not presented any evidence that the lack of a raised seal invalidates the state search warrant.  Detective Flynn testified that she has prepared numerous warrants and had them signed by state judges in Martin County, Florida.  At no time has she ever seen a seal placed upon any of those search warrants.  She observed the judge execute the original search warrant in this case.  Therefore, the Defendant's argument in that regard is discounted by this Court.

96.    The final matter rests on the government's reference to the good faith exception under United States v. Leon, 468 U.S. 897 (1984) and the line of cases following that standard.  When law enforcement acts with an objectively reasonable good-faith belief that their conduct is lawful or when their conduct involves only simple, isolated negligence, the deterrence factor as contemplated by the exclusionary rule loses much of its force and exclusion cannot pay its way.  Davis v. United States, 131 S.Ct. 2419 (2011).  Even if the District Court found that the search warrant in this case was invalid, the evidence submitted in this Court's view, supports the fact that the officers executed the search warrant within

the bounds of the <u>Leon</u> good faith exception analysis.  Under the exceptions to <u>Leon</u>, good faith would not be found where the judge issuing a search warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for reckless disregard of the truth, or where the issuing judge wholly abandoned his judicial role, or where the affidavit supporting a warrant is so lacking in indicia of probable cause as to render the official belief of its existence to be entirely unreasonable or where a warrant is so facially deficient that its reliance upon there by law enforcement is unreasonable.  None of those factors are present in the facts presented to this Court. Therefore, even if the search warrant is invalidated, this Court finds that the good faith exception under the <u>Leon</u> progeny of cases is applicable.

97.    In summary, this Court finds that there was a valid oral consent given by Ms. Jackson to law enforcement concerning the search of her home and the Defendant's room for evidence of his being shot.  The oral consent was very quickly thereafter confirmed by a written consent form signed by Ms. Jackson for her home.  The evidence observed by the officers in searching the room pursuant to that consent revealed a jacket with a heavy object later found to be a gun.  That jacket was lying on the floor of the Defendant's open bedroom in plain view.  That information was then communicated and utilized within the affidavit and was appropriately included in such affidavit.

98.    The affidavit as redacted by the Court still contains sufficient probable cause to justify its issuance.  It was lawfully issued by a state judge as the testimony reflects. Finally, even if the warrant is excluded, the execution of the warrant by the officers was in good faith and within the progeny of cases cited by this Court under <u>Leon</u>.

**ACCORDINGLY**, this Court recommends to the District Court that the Defendant's Motion to Suppress [D.E. #35] be **DENIED**.

The parties shall have up to and including December 22, 2015 within which to file any objections to this Report and Recommendation with the Honorable Robin L. Rosenberg, the United States District Judge assigned to this case.  Pursuant to Federal Rules of Criminal Procedure, Rule 59(b)(2), failure to file objections timely waives a party's right to review and bars the parties from attacking on appeal any legal rulings and factual findings contained herein.

**DONE AND SUBMITTED** this _____ day of December, 2015, at Fort Pierce, Northern Division of the Southern District of Florida.

FRANK J. LYNCH, JR.
CHIEF UNITED STATES MAGISTRATE JUDGE

Copies furnished:
Hon. Robin L. Rosenberg
AUSA Carmen M. Lineberger
Michael G. Smith, Esq.

29